No. 22103.

EARL E. HOWEY AND JEAN H. HOWEY *v.* RICHARD H. ESHE AND LOIS MAE ESHE.
(452 P.2d 393)

Decided April 7, 1969.

MEADOFF and MEADOFF, HAROLD MEADOFF, EDWARD L. KIRKWOOD, for plaintiffs in error.

MACK WITTY, for defendants in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.[*]

ON February 4, 1963, Earl E. and Jean H. Howey commenced an action in the district court of Park county in which numerous persons, including Lois Mae Eshe, Richard H. Eshe and one B. H. Portis, were named as defendants. The Howeys sought an adjudication of the rights of all the parties in an abandoned railroad right-of-way adjoining the town of Jefferson in Park county, and a decree that none of the defendants had title or rights of any kind in the described property. This action was No. 3584 in the district court.

On April 10, 1963, Richard H. Eshe and Lois Mae Eshe filed an action numbered 3587 in the district court of Park county naming numerous defendants, including Earl E. and Jean H. Howey, in which they sought a decree quieting title in them to certain described real

[*]Retired Supreme Court Justice sitting under assignment by the Chief Justice under provisions of Article VI, Section 5(3) of the constitution of Colorado.

estate which included that portion of a former right-of-way of the Colorado and Southern Railway Company which was the subject matter of the suit theretofore filed by Howeys.

All claims of other parties having been resolved, the two cases were conslidated for trial as between the Howeys and the Eshes, and the area of land to which each of them claimed ownership was the old railroad right-of-way which had been abandoned by the Colorado and Southern Railway Company in 1938. This was a strip of land approximately 65 feet wide and 495 feet long bordering the southwest corner of the town of Jefferson. The 495-foot frontage runs parallel to U. S. Highway 285.

The Howeys claimed title to the disputed parcel of land under conveyances to their predecessors in interest and a deed from Mamie Head Young to them. They also claimed ownership of the property on an alternate theory of payment of taxes on the land for more than seven continuous years under "color of title." The undisputed evidence was to the effect that Howeys were the holders of the record title to the property.

The Eshes by answer denied that the Howeys were owners of the disputed tract of land, and affirmatively alleged that "Richard H. Eshe and Lois Mae Eshe are the owners in joint tenancy, and in possession of said property." This asserted ownership is based solely upon their claim that title to the disputed ground had been acquired by adverse possession thereof by one B. H. Portis who gave certain deeds to them as hereinafter described. The issues were tried to a jury which found "the issues herein joined for the Defendants Richard H. Eshe and Lois Mae Eshe, and against the Plaintiffs Earl E. Howey and Jean H. Howey."

It is clear that no part of the railroad right-of-way was inside the limits of the town of Jefferson. The southern boundary of the town as platted was Crosier Street. Property lying north of this town limit was, at all times

pertinent to this controversy, described by lot and block numbers. In 1938 Mamie Head Young became the fee title owner of property lying on each side of Crosier Street and by her deed dated in November 1939 she conveyed to B. H. Portis lots in the town of Jefferson lying north of Crosier street extending the full length of the property in dispute. All the area conveyed to Portis was described by lot and block numbers, and none of the property thus described included any part of the railroad right-of-way.

In 1961 Portis gave a warranty deed to the Eshes conveying the identical property, described by lot and block numbers, which he had received under his deed from Mamie Head Young. When the controversy arose over ownership of the railroad right-of-way lying to the south of the lots described in the deed from Portis to Eshes a quitclaim deed was signed by Portis conveying to Eshes any interest he may have had in the abandoned right-of-way. This deed was dated June 3, 1963, which was four months after the Howeys filed their complaint. Portis at that time was at least 87 years old.

It is undisputed that the railroad right-of-way was abandoned in 1938. Following this abandonment and the completion of U.S. Highway 285, which ran parallel to the old railroad, an area approximately 495 feet in length by about 65 feet in width was opened up north of the highway fence. When Portis bought his lots from Mamie Head Young in 1939 he extended the fence along the east and west boundaries of his lots across this 65 foot strip to "tie in to the highway fence." Mamie Head Young, the record title owner of the strip, did not object to this fence extension since she and Portis had always been "good friends."

A deposition of Portis was taken in October 1963 upon the request of counsel for the Eshes. Counsel for Howeys was present and cross-examined Mr. Portis. The questionable competency of Portis as a witness is quite apparent throughout the entire deposition. For purposes

of illustration we quote a few of the questions and answers contained therein:

"Q. Mr. Portis, did you always claim this land under fence; did you think it was yours, the portion that you had fenced?

(Obj.) * * *

"A. I can't get that through my head. I think I did claim all that. It was under fence. It might have been some question there otherwise, too, mixed up in that, I'm not too sure.

"Q. Did you always use all of the land that was under the fence?

"A. I don't believe I did. I don't believe it was all deeded that was under fence. Now, that's my idea of it. But this stuff coming up, why, I don't know who's got memory enough to answer a lot of these questions after the years gone by, and I don't fancy them a damn bit.

\* \* \*

"Q. Did you know that Mamie Young had paid taxes on the railroad right-of-way?

"A. Yes, I think so.

"Q. And did you know that she had always claimed the right-of-way?

"A. I don't know as I could be expected to answer some of those questions, because it's clear out of my business entirely. And I want to tell you right here right now that I am not any spring chicken any more, and I will bet you anything you fellows around here, when you get up my age, you can't answer any more questions than I can. Now, that's what I think.

\* \* \*

"Q. Did you ever tell Mr. Howey, do you remember telling Mr. Howey that you weren't claiming the railroad right-of-way.

"A. I think I probably did.

"Q. That you did —

"A. I think so.

"Q. — tell Mr. Howey that you weren't claiming the railroad right-of-way?

"A. I think I did tell Mr. Howey that, I think, if I remember right.

"Q. Was that a long time ago?

"A. And there is another thing, too, that's a long time ago, and the questions you ask me I may answer them right and maybe I don't. Now, I wouldn't gamble on it, some of these questions I may answer right."

Fifteen months later Portis was subpoenaed to appear for a second deposition to be taken on January 18, 1965. He did not appear and the record contains a statement from his physician dated January 18, 1965, in which he stated that the physical condition of Portis prevented his appearance and that:

"I recently saw this 89-year old man at his home after an apparent mild stroke. Also his memory for recent events is so poor as to make his testimony of questionable value."

The foregoing points up the physical and mental condition of the man who executed the quitclaim deed to Eshes on the 3rd day of June 1963, purporting to convey some interest in the abandoned right-of-way.

On October 23, 1964, counsel for Howeys served upon Mr. Portis a request for admissions under R.C.P. Colo. 36, in which he was asked to admit or deny twelve pertinent statements of fact claimed to be true by the Howeys. On November 13, 1964, only two months before the physician wrote the above-mentioned letter, the response of Mr. Portis to the request for admissions was filed. It was signed and sworn to by him. In view of the statements contained in the deposition taken in 1963, and the worsening condition of Mr. Portis as evidenced by the statement of his physician on January 18, 1963, the answer to the request for admissions is truly an amazing document. It is replete with precise and technical legal language, full of voluntary assertions operating to the benefit of the Eshes, and reflects a keen recollection

of all pertinent facts on the part of Mr. Portis which is wholly incompatible with every other page of the record in which he appears as a participant. As a statement of the legal position to be taken by counsel for the Eshes for the information and guidance of counsel for Howeys, it was not necessarily objectionable. However as an exhibit to be read to the jury it contained nothing whatever which was proper for consideration. Over the objection of the Howeys' counsel, the trial court permitted the request for admissions, and all the "answers" which were made thereto over the signature of Portis, to be read to the jury. No opportunity whatever was provided counsel for the Howeys to cross-examine Portis on the "answers" to which his signature appears.

R.C.P. Colo. 36 does not provide a method for sidestepping the necessity of establishing facts by witnesses who submit themselves to cross-examination. Admissions, denials, or voluntary statements contained in response to a request for admissions under R.C.P. Colo. 36 fall far short of the stature of a deposition. In the instant case the reading to the jury of the "requests" and the lengthy answers thereto was fatally erroneous. The responses sought were for the information of counsel for the Howeys in the preparation of their case. They were hearsay of the purest kind; were highly prejudicial; and their reception in evidence was erroneous. As "evidence" they could only have been used for impeachment purposes if Portis had appeared as a witness at the trial.

Counsel for Howeys argue that the only "evidence" tending to establish the kind of "adverse" possession required by law to sustain the judgment of the trial court, was that contained in the response to the request for admissions over the signature of the nonappearing Portis. With this statement we agree.

The Eshes in relying upon "adverse" use of lands to which the Howeys had record title "had the burden of proving such usage by clear and convincing testimony."

*Commissioners v. Madsen,* 153 Colo. 247, 385 P.2d 601; *Evans v. Welch,* 29 Colo. 355, 68 P. 776.

We have read the full testimony and examined the exhibits which were received in evidence. As a matter of law we are compelled to say that no competent evidence was presented upon the trial on which a jury would be justified in finding a verdict for the Eshes on their claim of adverse possession of the abandoned railroad right-of-way.

The judgment is reversed and the cause remanded with directions to enter judgment in favor of Earl E. Howey and Jean H. Howey.

MR. JUSTICE PRINGLE specially concurring.

MR. JUSTICE PRINGLE specially concurring:

I agree with the majority that under the circumstances of this case the answers to the requests for admissions were improperly admitted into evidence. They were strictly self-serving declarations with no opportunity to cross-examine.

However, I think the disposition which the majority makes of this case is wrong. In my view, the case should be remanded to the district court for a new trial.

I do not think it proper, under the circumstances of this case, for this Court to strike from the record evidence which was improperly admitted and then determine that the remaining evidence does not support the judgment. In my view, we should not take it upon ourselves to determine that there was no other evidence available to the prevailing party to support his judgment other than that which was stricken.

I would therefore, as I have said, remand the case for a new trial and permit the parties to present whatever proper evidence they might have to support their position.